UNITED STATES of America, et al.

v.

**Christopher PADDACK, Appellant.**

No. 86–5371.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 18, 1987.

Decided Aug. 7, 1987.

Walter H. Fleischer, Washington, D.C., with whom Alfred F. Belcuore, was on the brief, for appellant.

John D. Bates, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGeno-

va, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Diane M. Sullivan, Asst. U.S. Attys., were on the brief, for appellees.

Before WALD, Chief Judge, and BORK and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting Opinion filed by Circuit Judge BORK.

SILBERMAN, Circuit Judge:

This is an appeal from a district court order reversing a decision of the Foreign Service Grievance Board (the "Board"). The issue is whether the Board acted arbitrarily and capriciously or contrary to law in holding that applicable regulations governing travel by foreign service officers permitted appellant, Christopher Paddack, to travel with his family from New Orleans, Louisiana to St. Louis, Missouri on the "Mississippi Queen," a luxury riverboat plying the waters of the Mississippi River. The district court, interpreting the regulations *de novo*, held that Paddack violated those provisions requiring him to make a "conscientious effort to minimize costs" and to "exercise good judgment." Because we believe that the district court exceeded its scope of review and that the Board's opinion is not arbitrary, capricious, or contrary to law, we reverse.

## I.

Christopher Paddack, a foreign service officer employed by the United States Information Agency ("USIA" or "Agency"), was, until July, 1982, stationed at the American Embassy in Montevideo, Uruguay. In February of that year, he began preparing for his next assignment in Washington, D.C. Paddock planned to leave Montevideo in July and take approximately fifteen days of authorized leave in Burlington, Iowa before reporting to Washington in August. Before scheduling his trip, Paddack consulted extensively with the Embassy's Administrative Officer, who routinely handles travel matters for Embassy personnel, and with the State Department's Office of Operations, Supply and Transportation Branch ("travel office"), which issues and interprets travel regulations for the foreign service. Paddack proposed the following itinerary for his trip to Burlington: air from Montevideo to Santiago, Chile; ship to Lima, Peru; air to New Orleans; riverboat to St. Louis; and rental car to Burlington. The Embassy Administrative Officer assured Paddack that the high cost of his proposed riverboat travel would not bar the trip and, in response to a request for State Department authorization, the Department's travel office declared that the identified itinerary "could be considered direct" travel—the critical factor determining whether or not the route was authorized under the regulations. The Embassy's travel office made arrangements for Paddack's travel and issued him tickets and other necessary documents.

Paddack and his family left Montevideo on July 2, 1982 and, after minor deviations from the original itinerary,[1] boarded the Mississippi Queen in New Orleans on July 12. The Paddacks enjoyed a leisurely cruise (costing $12,760) up the Mississippi River. When they reached St. Louis, Paddack asked if the boat stopped further upriver at Burlington, his ultimate destination. Informed that he could debark by ladder at that location, Paddack booked passage onward to Burlington, directing that the extra cost be billed to the Agency. After his authorized leave in Burlington, Paddack began his duties in Washington, D.C.

Shortly after Paddack arrived in Washington, he submitted his travel voucher documenting his complete itinerary. (USIA had, apparently, routinely paid all of Paddack's pre-approved travel expenses, including the bill for the New Orleans to St.

1. The Embassy's travel office changed Paddack's point of entry into the United States from New Orleans to Miami. Because his flight into Miami was delayed, Paddack missed his connecting flight to New Orleans and was forced to stay overnight at a motel in Miami and fly to New Orleans the next day.

Louis leg of his riverboat trip). Unbeknownst to Paddack, however, an employee of USIA's Finance Office subsequently revised Paddack's voucher to add a claim on his behalf of $4,013.82 for *per diem* compensation and other expenses. Two months later, in October of 1982, this matter came to the attention of James Kohler, Chief of the Financial Operations Division of USIA's Comptroller's Office, when the Delta Steamboat Company wrote USIA to request payment of $1,680 for the St. Louis to Burlington leg of the trip. "Shocked," as he later testified, at the amount involved, Kohler examined Paddack's entire trip and discovered not only the $4,000 *per diem* request, but also the $12,760 cost of the New Orleans to St. Louis leg. Although Kohler tentatively decided not to pay the *per diem* request and supplemental riverboat bill, he took no formal action until nine months later when he wrote the Comptroller General requesting an "advance decision" on the propriety of paying for "excessive transportation costs and *per diem* incurred for travel via ship by Mr. Christopher Paddack between New Orleans, Louisiana and Burlington, Iowa ($17,371.25)."[2] He did this, Kohler testified, to obtain protection against personal liability should the decision to pay these amounts later be deemed contrary to law. *See* 31 U.S.C. §§ 3527, 3528 (1982). Although the bill for the New Orleans to St. Louis part of the trip had already been paid, (so a truly "advance" decision concerning this expenditure would be impossible to obtain) he nevertheless asked the Comptroller General to decide not only "whether the Agency should pay for 16¾ days of *per diem* [and] the cost of transportation between St.

Louis and Burlington," but also whether "Mr. Paddack should be required to reimburse the Agency for transportation cost between New Orleans and St. Louis."[3]

Kohler sent over his advance decision request shortly after GAO had independently discovered Paddack's riverboat travel during a routine audit of USIA's finances. In a draft audit report dated June 24, 1983, the GAO questioned, *inter alia*, the legitimacy of this type of travel. After directing his own investigation of Paddack's trip, USIA's Director, Charles Z. Wick, responded to the report on July 25, 1983, writing that GAO had "identified what appears to be a weakness in the present system which permits foreign service personnel transferring between posts to travel one way by surface transportation regardless of cost." After briefly summarizing the procedure by which Paddack obtained permission for the trip, Wick concluded: "[a]fter investigating this case, the Agency determined that the traveler acted *within* the provisions of current regulations (6 FAM 131.1–2c)." (emphasis added). He then expressed his concern about those travel regulations:

> [W]e fully agree with the [GAO's] judgment that the cost of the trip ($12,760) for four first-class riverboat fares from New Orleans to ride far up the Mississippi is not an appropriate use of Agency resources. Since the regulations in question govern the travel of all foreign affairs personnel, we are asking the State Department ... to take up this matter at an early date with the objective of prohibiting such exorbitant surface travel in the future.[4]

2. 31 U.S.C. § 3529 (1982) allows a certifying official of an agency to request a decision from the Comptroller General on a question involving a voucher presented to that official for certification.

3. We cannot determine from the record what, if anything, occurred between October of 1982, when the *per diem* request and the $1,680 bill came to Kohler's attention, and July of 1983, when Kohler requested advice from GAO. It appears USIA did not pay Paddack any of the $4,013.82 *per diem* ostensibly requested, nor did it pay Delta Steamboat Company's $1,680 bill. Although Kohler interviewed Paddack about the

circumstances of his trip in October, 1982, Kohler apparently did not seek to obtain reimbursement for the amounts previously paid until the following summer. At some point during or after his conversation with Kohler, Paddack dropped his claim for reimbursement for the St. Louis to Burlington leg of the trip.

4. The foreign service travel regulations were, in fact, subsequently revised to limit use of ship transportation to those circumstances where air transportation would be detrimental to health or well-being. *See* United States Information Agency Circular Nos. 76D & 67F (Dec. 2, 1985).

508

Apparently unpersuaded by Wick's view of the regulations, the Comptroller General, on February 14, 1984, issued his formal response to Kohler's "advance decision" request, declaring that Paddack's travel failed to comply with applicable travel regulations. The Comptroller General's opinion concluded: "[a]ction should be initiated by USIA to recoup from Mr. Paddack the transportation cost of $12,760 paid ... for the riverboat travel, less any unpaid amount properly reimbursable." *See* Decision of the Comptroller General No. B–212445 (Feb. 14, 1984). Six weeks later, USIA's Kohler wrote Paddack informing him that the Comptroller General's decision had *"directed* the Agency to initiate the appropriate action to recover from [Paddack] the extra transportation expenses incurred." Kohler ordered Paddack to pay USIA $11,178.30 within 30 days. In response, the American Federation of Government Employees, Local 1812, filed a grievance on behalf of Paddack, objecting that USIA's effort to collect the disputed amount violated Paddack's procedural rights, that USIA was not authorized to obtain an "advance" GAO decision on the propriety of Paddack's travel after it had already paid for that travel, and that, since Paddack's trip had been officially authorized, the Agency, and not Paddack, should bear any liability for wrongfully incurred travel costs. USIA denied Paddack's grievance. The Agency rejected each of Paddack's specific contentions and declared itself obliged under the Comptroller General's decision to collect the disputed amount. We quote the relevant parts of the Agency's letter:

[31 U.S.C. § 3702] provides: "all claims and demands whatever by the Government of the United States or against it,

and all accounts whatever in which the Government of the United States is concerned, either as a debtor or creditor, shall be settled and adjusted in the General Accounting Office." Section 3526 of the same title provides: "Balances certified by the General Accounting Office, upon the settlement of Public accounts, shall be final and conclusive upon the Executive Branch of the Government ..." It necessarily follows that this Agency and all other agencies within the Executive Branch [7] are bound by the findings and determinations made by the Comptroller General in Decision No. B–212445 so far as the existence and amount of the debt owed by Paddack to the Government is concerned.

.    .    .    .    .

[7] This would include, *inter alia,* the Foreign Service Grievance Board should this proceeding be presented there.

.    .    .    .    .

Paddack has the right ... to request reconsideration of Comptroller General Decision No. B–212445, but that request must be presented directly to the General Accounting Office. That Decision cannot be questioned via the Foreign Service Grievance System.... Even if I, as the Agency official charged with Agency level review of grievances, had jurisdiction to consider Paddack's complaint as a grievance, I would arrive at the same findings and conclusions as did the Comptroller General in Decision No. B–212445.

USIA's letter concluded by noting that Paddack had the right to submit his complaint to the Foreign Service Grievance Board,[5] which he did on July 6, 1984. In

[5] The Foreign Service Grievance Board is an independent adjudicatory body whose function is to adjudicate grievances filed by members of the foreign service. *See* 22 U.S.C. §§ 4135–37 (1982). The Board is composed of five persons, not employed by a foreign affairs agency or by the foreign service, who are appointed by the Secretary of State from a list of nominees approved both by the foreign affairs agencies and by the labor unions representing foreign service employees. *See* 22 U.S.C. §§ 4135(a), (b) (1982). The list of grievances over which the Board has jurisdiction is broad; it may adjudi-

cate disputes involving separation from employment, disciplinary actions, complaints relating to the employee's working environment, prejudicial information in the employee's personnel records, and "denial of [a] ... financial benefit to which the member claims entitlement under applicable laws or regulations." *See* 22 U.S.C. § 4131(a)(1) (1982). If the Board determines that an employee's grievance is meritorious, it may direct the agency to take remedial action. *See* 22 U.S.C. § 4137(b) (1982). Any party aggrieved by a Board decision may obtain judicial

his grievance, Paddack directly challenged the GAO's view that the foreign service travel regulations prohibited his riverboat trip, setting forth his own interpretation of the applicable regulations (discussed in greater detail *infra*). USIA responded initially by arguing the Board lacked jurisdiction to hear the grievance because the Comptroller General's decision bound all executive branch entities, including the Foreign Service Grievance Board. The Board rejected this argument, holding, in essence, that although GAO decisions approving agency expenditures may preclude GAO from later objecting to expenditures made by agency financial officers, such decisions do not prohibit the Board from independently resolving employee grievances. The Board then held three days of hearings, during which it took extensive testimony from Paddack, expert witnesses from the State Department, and other participants in the controversy. On July 23, 1985, the Board sustained Paddack's grievance in a lengthy opinion holding that the applicable regulations permitted Paddack to travel on the Mississippi Queen. The Board ordered USIA to cease its efforts to collect the disputed amount. USIA and the United States sought review of the Board's decision in the district court,[6] which reversed the Board on grounds that it misin-

terpreted the applicable travel regulations. Paddack now appeals.

## II.

The case against Paddack is predicated on two sections of the Foreign Service Joint Travel Regulations contained in Volume 6 of the Foreign Affairs Manual ("FAM"), which together are sometimes termed the "prudent travel rule." Travelers are required to make a "conscientious effort to minimize costs of official travel," 6 FAM § 114,[7] are obliged to use "the most direct and expeditious routes consistent with economy and reasonable comfort and safety," and are expected to exercise "good judgment in costs they incur for all official transportation expenses as if they were personally liable for payments." 6 FAM § 115. Section 115 also makes the traveler ultimately responsible for unauthorized travel, even though government officials may have assisted in making travel arrangements.[8] USIA, before the Board and before us, claims that Paddack did not inquire into the cost of his trip and therefore failed to make a "conscientious effort to minimize costs" as required by section 114. The Agency also contends that Paddack's travel on the Mississippi Queen violated section 115's direction that foreign service officers travel by "the most direct and expeditious routes consistent with economy

review of that decision in the United States District Court, *see* 22 U.S.C. § 4140 (1982), which reviews the Board's decision under the provisions of 5 U.S.C. § 706 (1982).

6. Although the United States was not a party to the proceeding before the Board, it was added as a named party to this lawsuit. The applicable judicial review provision, 22 U.S.C. § 4140 (1982), provides that "[a]ny aggrieved party" may obtain judicial review of a Board decision. To be an "aggrieved party," one must generally have been a party to the administrative proceeding below. *See Simmons v. ICC,* 716 F.2d 40, 42 (D.C.Cir.1983). Since the United States did not participate in the Board proceeding, it cannot seek review in its own name.

7. Section 114 provides in full:
   In accordance with the provisions of law and these regulations, Foreign Service employees and the members of their family are entitled only to actual and necessary expenses incurred in the performance of official travel. Travelers are expected to make a conscientious effort to minimize costs of official

travel and to assume costs of a personal nature and any additional expenses incurred for personal convenience.
6 FAM § 114.

8. Section 115 provides in pertinent part:
   Employees and their dependents traveling under official travel authorizations are expected to use the most direct and expeditious routes consistent with economy and reasonable comfort and safety. By the same token, employees are expected to exercise good judgment in the costs they incur for all official transportation expenses as if they were personally liable for payments.

   .     .     .     .     .

   The traveler is responsible for the correct performance of official travel and for the payment of any charges incurred through failure to comply with the governing regulations, regardless of who may have assisted the traveler in making travel arrangements....
6 FAM § 115.

and reasonable comfort and safety." It is argued that train travel between New Orleans and St. Louis would have been far less costly, yet still offer the Paddacks reasonable comfort and safety; therefore, by declining to take the train, Paddack violated the prudent travel rule.

The Board, after taking evidence of Paddack's conduct and listening to opposing interpretations of the travel regulations, rejected USIA's position. It first concluded that Paddack made a reasonable effort to determine whether cost or any other restrictions would preclude his trip. Turning to the question whether ship travel in this instance offended the prudent travel rule, the Board determined that the hortatory language contained in sections 114 and 115 must be read in light of other travel regulations that define in detail the modes and routes of travel available to foreign service officers. The prudent travel rule, according to the Board, does not oblige Paddack to reimburse the government for his expenses on the Mississippi Queen unless those expenses were "incurred through *failure to comply with the governing regulations.*" 6 FAM § 115 (emphasis added). The Board therefore turned its attention to the question whether Paddack had complied with the more specific regulations governing foreign service travel.

In his presentation to the Board, Paddack observed that USIA officers engaging in home leave travel face limitations on two aspects of that travel—the mode and the route. Mode refers to the manner of one's travel, *e.g.,* airplane, ship, train.[9] Although the principal regulation defining permissible modes of travel for foreign service officers states that air travel is "encouraged," it also makes clear that "surface transportation" is "authorized" (unless some other

regulation prohibits it). *See* 6 FAM § 131.-1-1. The rule specifically applicable to USIA employees traveling on home-leave says simply that travel must be by "[a]ir at least one way." 6 FAM 131.1-2(c)(2). That rule does not, however, prevent "surface travel" the other way.[10] Paddack's riverboat trip was, of course, a form of "surface travel," so the question arises whether this mode was authorized. Paddack argued, without contradiction, that the regulations clearly authorize ship travel, *see, e.g.,* 6 FAM §§ 131.1-1, 133, 141, and also emphasized, again without contradiction, that foreign service officers have frequently traveled by luxury liners such as the Queen Elizabeth II. Analogizing his riverboat travel to concededly permissible ship travel, Paddack argued his choice of mode was likewise permitted.

The agency initially sought to avoid the force of this point by distinguishing between "ship" travel and "boat" travel, contending that while the regulations permit "ship" travel, Paddack's trip occurred by river*boat* and thus was unauthorized. USIA argued that section 141o allows "boat" travel, as opposed to ship travel, only when specifically "authorized or approved as advantageous to the Government," 6 FAM § 141o, and that the government had made no such determination here. The Board easily disposed of this exercise in semantics, concluding that these regulations did not mean to distinguish between a passenger ship and a passenger riverboat. It first noted that section 141a authorizes "Travel on railroads, aircraft, ships, buses, streetcars, taxicabs, *and other usual means of conveyance,*" 6 FAM § 141a, and riverboats—even if not "ships"—are certainly a "usual means of conveyance" on the Mississippi River. The uniquely onerous requirements of section 141o, the

---

**9.** Section 131.1 makes clear that a "mode of travel" is more specific than just "surface transportation." Rather, the regulation specifically contemplates different "modes" of surface transportation. *See e.g.,* 6 FAM § 131.1-1 (freighters, ships); 6 FAM § 131.1-2(c)(3)(a) (rail, private conveyance).

**10.** This rule, it appears, was drafted with a round-trip home-leave excursion in mind. Had

Paddack, for example, returned to Montevideo from his home-leave in Burlington, the "air at least one way" provision would require that this return trip be made by air. Of course, Paddack did not return to Montevideo; the second half of his travel consisted of a trip from Burlington to Washington, D.C.—a trip he made by air, apparently in satisfaction of section 131.1-2(c)(2).

Board determined, apply only to the chartering or renting of a whole boat and not to Paddack's mere purchase of tickets on a regularly scheduled voyage. USIA has not pursued these arguments on appeal.

The Board accepted Paddack's construction of the regulations defining permissible modes of travel, concluding that Paddack selected an appropriate mode. The question remaining, then, was whether he selected an appropriate route. Foreign service officers are subject to a regulation entitled "Direct Travel," which states that "[a]ll official travel must be by a usually traveled route." 6 FAM § 131.2. And "usually traveled route" is defined by section 117v as "[o]ne or more routes which are essentially the same in cost to the Government and in travel time." 6 FAM § 117v. As the Board noted, this is the first and only place in the regulatory thicket where the traveler is directed to consider speed and cost in making travel decisions. Under the Board's interpretation, the traveler is free to choose from *among* all authorized modes, without regard to their comparative speed and cost, but when he selects a route for his mode of choice, the prudent travel rule demands that the traveler act conscientiously to minimize cost. This view is supported by the last sentence of section 117v (defining "usually traveled route"), which says "[s]election of usually traveled routes will depend on the authorized mode or combination of modes." *Id.* Selection of mode is thus a decision made before, and entirely independent from, the selection of route.

Since no rule expressly requires travelers to choose from different modes based on their cost, and since ship travel is a *specifically* authorized mode despite its higher cost than air or train travel, the Board reasoned that Paddack was required only to compare the cost and speed of different available routes for his riverboat trip. The Board determined that the "direct travel" requirement of section 131.2 means simply that the traveler cannot geographically deviate for personal reasons from the "usually traveled route" between his point of departure and his point of destination. Since Paddack's riverboat trip from New Orleans to St. Louis took him up the Mississippi River, a "usually traveled route" for ship travel between the two points, the Board found Paddack's trip permissible under the direct travel rule.[11]

The Agency acknowledged before the Board and before us that the regulations permit surface travel even in instances where travel by air would be less expensive; had Paddack been traveling, for example, from London to New York, he could have booked passage on the Queen Elizabeth II, even though flying by commercial airline would have saved the government a considerable amount of money. Still, although conceding that travelers are not obliged to compare costs between air travel and surface travel, USIA argues travelers must nevertheless compare costs between different modes of *surface* travel. The Agency thus distinguishes the regulations' tolerance of high-priced travel on the Queen Elizabeth II by explaining that ships are the only form of surface travel across the Atlantic Ocean. But, USIA contends, because Paddack was traveling from New Orleans to St. Louis—not across the ocean—he had an obligation to compare the costs of ships, trains, and other modes of available surface travel; and since train travel is demonstrably faster and cheaper than ship travel, Paddack was obliged to go by train. The Agency cites no specific rule requiring inter-modal cost comparisons, but argues that the obligation is implied in section 131.2's requirement that foreign service officers travel by a "usually traveled route." In so doing, however, USIA fails to explain the apparent incongruity of requiring cost comparisons between different modes of surface travel but not between surface travel and air travel. Nor does the Agency reconcile its theory with

---

11. It also appears that the prudent travel rule would discourage a traveler from choosing the most expensive carrier for a mode of travel, *i.e.*, a traveler may not fly the Concorde from Paris to New York if a less expensive flight is available. The government, however, does not argue that Paddack was required to choose a less expensive carrier for his boat trip up the Mississippi River.

section 117v's implication that section 131.2 requires cost comparisons only between routes and not between modes. Finally, the Agency fails to explain how section 115's rule that travelers "are expected to use the most direct and expeditious routes ..." can be read to require use of a direct and expeditious *mode.*

Relying on its independent reading of the regulations and the testimony of two State Department travel experts who disagreed with USIA, the Board determined that the regulations defining allowable modes and routes of travel gave sufficient authority for Paddack's riverboat trip. It also found his travel decisions permissible under the prudent travel rule because he candidly described his intended itinerary when seeking authority for the trip and because his choice of route was made with sufficient concern for speed and cost.[12]

### III.

■ It may well be that the real parties in interest in this case are not USIA and Paddack, but rather GAO and Paddack, and that the true legal dispute before us is actually between the Foreign Service Grievance Board—which adopted Paddack's interpretation—and GAO. USIA, according to the record, felt obliged to abandon its original interpretation of the regulations (which supported Paddack) and assert GAO's position before the Board and the federal courts. Whether USIA's volteface was legally required—whether GAO's opinion can bind USIA without running afoul of constitutional separation of powers principles, *see Bowsher v. Synar,* —— U.S. ——, 106 S.Ct. 3181, 3192, 92 L.Ed.2d 583 (1986)—we have no occasion to decide. In any event, as the government itself emphasized, the Foreign Service Grievance Board is "an independent adjudicatory Board whose decisions generally are binding on the grievant and agency alike subject only to review under 22 U.S.C. § 4140." (Appellant's Supplemental Brief at 12). Nothing in the Board's authorizing legislation sug-

gests that the Board is required even to consider the GAO's opinion with respect to statutory or regulatory interpretations, let alone—as the government argues—accord it deference. Furthermore, GAO's decision in this case lacked the characteristics necessary to entitle it to deference. The Comptroller General's determination was made without benefit of a hearing or extensive inquiry. Neither Paddack nor any other witness had an opportunity to offer evidence concerning Paddack's conduct, and GAO adopted its interpretation of the travel regulations without the benefit of any advice from those most familiar with them—employees of the State Department's travel office. Although the Board did examine GAO's opinion, it found several erroneous conclusions attributable to GAO's failure to obtain all the relevant facts. Given the statutory requirement that the Board "ensure the fullest measure of due process for the members of the Foreign Service," *see* 22 U.S.C. § 3901(b)(4) (1982), we cannot fault the Board for refusing to defer to the GAO's decision.

■ We think the Board was also correct in affording no deference to the regulatory interpretation offered by USIA at the grievance hearing. After all, as we have noted, the Agency earlier had agreed with Paddack and only disputed his interpretation after GAO directed USIA to abandon its prior position. We do not normally defer to a vacillating agency position, *see National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1571 (D.C.Cir.1987); *Japan Air Lines Co., Ltd. v. Dole,* 801 F.2d 483, 486 (D.C.Cir.1986), and therefore see no reason why the Board could not similarly decline to defer to USIA—particularly where, as here, USIA's sudden reversal was apparently coerced by a legislative branch agency.

■ Nor are we persuaded that the State Department's interpretation received inadequate respect. It is certainly true

---

12. USIA had also charged that Paddack defrauded the United States Government by misrepresenting his travel plans when seeking approval for the trip. The Board emphatically rejected

that claim, finding it "not supported by any evidence" and went on to conclude that Paddack's actions were, in fact, "open and above board."

that as the drafter of the regulations, the State Department is normally entitled to deference. *See Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). But the only relevant evidence from the State Department concerning the legitimacy of Paddack's travel suggests the Department *supported* his position. The Department routinely approved Paddack's trip (as well as many other luxury ship excursions for foreign service personnel) and two State Department travel experts, Charles McKinnon and Warren Nixon, testified that the regulations permitted Paddack's itinerary. Although the Board allowed the State Department to intervene in the grievance hearing in recognition of its experience interpreting travel regulations, apparently the Department's sole response was to offer a cable written by Secretary of State Shultz in December, 1984 declaring Mississippi riverboat travel impermissible. But that statement came two years after Paddack's trip and did not purport to have retroactive value. It was issued, moreover, only after Paddack's trip became the subject of formal grievance litigation and therefore was due little weight. *See Nordell v. Heckler*, 749 F.2d 47, 48 (D.C. Cir.1984).

▇ That brings us to the major issue in the case. Do we owe deference to the Board's interpretation of the travel regulations or are we free—as the district court apparently concluded—to adopt our own interpretation of the regulations? The government argues that *de novo* review is appropriate because the Board did not promulgate the regulations and does not bring any particular expertise to bear on their interpretation. It is indeed true that our deference usually acts in favor of an agency's interpretation of its *own* regulations. *See, e.g., Jewett v. Commissioner of Internal Revenue*, 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 (1982); *Udall v. Tallman*, 380 U.S. at 16–17, 85 S.Ct. at 801. But we have also deferred to independent adjudicatory bodies charged with making decisions pursuant to regulations drafted by other agencies. It is established, for example, that deference is due the Merit Systems Protection Board's

interpretation of regulations promulgated by the Office of Personnel Management because Congress vested the MSPB with authority to review those regulations and limited the courts to "arbitrary and capricious" review of MSPB decisions. *See Nat. Treasury Employees Union v. United States Merit Systems Protection Bd.*, 743 F.2d 895, 912–13 & n. 23 (D.C.Cir.1984). *See also Zeizel v. Pierce*, 784 F.2d 405, 408 (D.C.Cir.1986); *Benjamin Franklin American Legion Post v. U.S.P.S.*, 732 F.2d 945, 947–48 (D.C.Cir.1983).

To be sure, we have—depending on the statute involved—sometimes deferred to a drafting agency rather than to an independent adjudicatory body when the two disagree over the interpretation of a regulation. *See Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1552 (D.C.Cir.1984) (deferring to Labor Secretary's interpretation of Labor Department regulation rather than interpretation of Federal Mine Safety and Health Review Commission). *See also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 n. 2 (D.C.Cir.1986) (following result in *Carolina Stalite*); *Brock v. L.R. Willson & Sons, Inc.*, 773 F.2d 1377, 1383, n. 7 (D.C.Cir.1985) (declining to decide who deserves deference when the Labor Secretary's interpretation of a Labor Department regulation conflicts with that of the Occupational Safety and Health Review Commission). But the primary drafting agency in this case—the State Department—has not offered a legally relevant interpretation that conflicts with the Board's, and we have already concluded that USIA (which has not even shown that it drafted the regulations) deserves no deference. In the absence of a true conflict between a drafting agency and an adjudicatory body, we need not concern ourselves with the Carolina Stalite problem. Instead, we need only decide whether the federal judiciary should defer to the Board's decision in this case.

We think it should. Congress has authorized us to set aside only those actions of the Board that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 22 U.S.C. § 4140 (incorporating 5 U.S.C. § 706). The government, arguing for *de novo* review,

asserts that this case presents only a question of regulatory interpretation—a pure question of law. But even were that true, deference would in our view be appropriate, indeed required, since the Board's expertise in interpreting these regulations, as compared with ours, is manifestly superior. *See National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1569–70 (D.C.Cir. 1987). The Board, as Congress presumably contemplated, often entertains grievances from foreign service officers involving travel benefits, and regularly confronts the kind of legal issues involved here. *See, e.g.,* Foreign Service Grievance Board Decision Nos. G–005(4) (1984); G–091(3) (1984); G–111(3) (1984); G–059(1) (1982); G–039(2) (1982); G–578 (1981); 548 (1981). Moreover, the prudent travel rule upon which USIA primarily relied in pressing its claim obliged the Board to assess Paddack's "conscientiousness" and "good judgment." That mixed factual/legal determination necessarily required the Board to compare Paddack's conduct to the prevailing customs and practices of the foreign service, a subject matter about which the Board has special expertise. We think Congress' decision to restrict our review to an "arbitrary and capricious" standard reflects a legislative judgment that the Board's familiarity with the foreign service ought to be respected by the judiciary. Giving effect to Congress' desires therefore requires the judiciary to avoid *de novo* review of the Board's interpretation of general or vague regulatory language, since inevitably the legal analysis behind the Board's decision is informed both by the Board's experience in foreign service matters in general and its factual findings in particular. We conclude that where, as here, no other agency is entitled to deference, the federal judiciary must defer to the Board's decision—including its interpretation of the travel regulations—if reasonable.[13]

■ Although the district court acknowledged at the outset of its opinion that its

review was governed by the arbitrary and capricious standard, it actually reviewed the Board's decision *de novo.* The court simply disagreed with the Board's handling of USIA's "boat" vs. "ship" argument, disagreed with its interpretation of the "Direct Travel" rule, felt Paddack had provided insufficient facts when seeking approval for the trip, and decided there was "no evidence in the record" to justify a finding that Paddack's actions were "conscientious and prudent." At bottom, the court concluded for itself—the Board's decision notwithstanding—that Paddack failed to act prudently. This was, given the deferential standard of review applicable here, a determination the court was not free to make.

■ Applying the appropriate standard of review, we think the Board's interpretation of the regulations quite reasonable. Despite USIA's almost half-hearted claim that the "plain meaning" of the regulations supports its interpretation, we find the regulations at least ambiguous as applied to the facts of this case. It was therefore surely permissible for the Board to rest its decision on the specific provisions governing the selection of mode and route instead of on the generally phrased prudent travel rule.[14] Indeed, the traditional maxim of statutory interpretation that specific rules control over general rules, *see, e.g., Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 867, 6 L.Ed.2d 72 (1961), supports the Board's approach. And, once it accepted the dominance of the specific over the general, we think it was reasonable for the Board to conclude that—at least prior to Secretary Shultz's 1984 circular—the regulations allowed Paddack to choose from among various modes of travel without regard to relative cost. If, as the government conceded, the regulations permitted travel by ocean liner, we think it a reasonable corollary that they permitted travel by riverboat.

Director Wick appears to us to have been on sound grounds the first time; the prob-

---

**13.** Given our decision to defer to the Board's evaluation of Paddack's actions, we, unlike the dissent, express no view of our own as to the quality of judgment exercised by Paddack.

**14.** Contrary to the dissent, *see* at 516, (Bork, J., dissenting), the Board did not interpret the specific travel regulations as displacing and thus rendering superfluous the more general prudent travel rule. *See,* maj. op. at 509–510, 511, 512 & n. 12.

lem with Paddack's trip lay primarily with the "weakness" in the pre–1985 regulations.

*Reversed.*

BORK, Circuit Judge, dissenting:

The majority holds that the Foreign Service Joint Travel Regulations required the government to pay for appellant Paddack's and his family's riverboat cruise up the Mississippi. I believe that Paddack's cruise was at his own expense.

I begin by setting out a few details about the Paddack family's sojourn on the Mississippi Queen. At the time of the Paddacks' travel, the Mississippi Queen was advertised as providing its passengers a luxurious floating resort hotel. *See* Appellant's Appendix at 257–58. With elaborate on-board accommodations and entertainment, the Queen plied its route at a maximum speed of about 7½ miles per hour, made frequent stops for day trips to historic sites and other on-shore attractions, and often did not travel at all overnight. On the Paddacks' trip from New Orleans to St. Louis, which is about 600 miles by air, the Queen meandered almost 1,100 miles upriver for twelve days. The trip cost over $12,000. It need hardly be said that this amount was grossly disproportionate to the cost of travel from New Orleans to St. Louis by other means. Though Paddack possessed an "advertising brochure" describing the Mississippi Queen's excursions and accommodations, and their cost, *id.* at 158–59, and though his questions to government travel personnel suggest his awareness of the high cost of the cruise, *see id.* at 156, Paddack apparently made no effort to determine the expected cost of his family's trip on the Queen. Paddack stated that he and his wife decided to take the cruise in order to renew, and expose their children to, the experience of "seeing riverboats as a normal mode of transportation on the river." *Id.* at 159–60.

My reasons for believing Paddack's cruise impermissible under the Travel Reg-

ulations are straightforward.[1] The Regulations require government employees to make a *"conscientious* effort to minimize costs of official travel," to accept liability for expenses "of a personal nature" or "for personal convenience," to select travel routes "consistent with economy and *reasonable* comfort and safety," and to "*exercise good judgment* ... as if they were personally liable for [their travel costs]." 6 *Foreign Affairs Manual* §§ 114, 115 (emphasis added). Accordingly, the traveler is liable for any charges "incurred through failure to comply with the *governing regulations.*" *Id.* § 115 (emphasis added). Nothing in the provisions of the Regulations that set out permissible modes of travel for various official purposes, *id.* § 131.1, provides a safe harbor from the Regulations' imposition of personal liability for excessive travel costs needlessly incurred. The general requirement that each traveler conscientiously exercise good judgment in his travel costs therefore necessarily suffuses the Regulations' detailed specifications and is not pre-empted by them. *See International Union, UAW v. General Dynamics Land Sys. Div.*, 815 F.2d 1570, 1575–76 (D.C.Cir.1987); *L.R. Willson & Sons, Inc. v. OSHRC*, 698 F.2d 507, 511–12 (D.C.Cir.1983); *Aeron Marine Shipping Co. v. United States*, 695 F.2d 567, 576 (D.C.Cir.1982). If it did not, the requirement would be virtually meaningless—a conclusion to be avoided in construing any regulation or statute. *See National Ass'n of Recycling Indus. v. ICC*, 660 F.2d 795, 799 (D.C.Cir.1981).

Simply put, Paddack's riverboat trip fails to satisfy any measure of a traveler's good judgment in arranging his travel back home. Whatever the outer bounds of a traveler's duties to make a "conscientious effort to minimize costs" and to incur travel costs "as if [he] were personally liable for" the costs, the Paddack family's cruise up the Mississippi on a riverboat was completely outside those bounds. A slow and leisurely voyage upriver on the Mississippi Queen at tremendous cost, with frequent

---

**1.** The statements made to Paddack by government employees whom he consulted about his itinerary are irrelevant. The Travel Regulations state that the traveler is responsible for compliance with the Regulations "regardless of who may have assisted [him] in making travel arrangements." 6 *Foreign Affairs Manual* § 115.

stops and excursions as well as many elaborate and luxurious diversions on board, could not reasonably be chosen by a conscientious government employee for travel at government expense.[2] Moreover, as the district court found, Paddack's indifference to the cost to the government of his family's luxury cruise is the antithesis of any conscientious exercise by a traveler of good judgment. Paddack's reason for taking his family on the cruise—to experience "riverboats as a normal mode of transportation on the river"—shows, if it were not already obvious, that this cruise was undertaken solely for the personal pleasure of the Paddack family.

The Grievance Board, and the majority of this panel, in effect have treated the specific rules regarding modes of travel as the only "governing regulations" with which a traveler must comply under section 115. *See* Appellant's Appendix at 40–41; maj. op. at 510. But the regulations establishing the general requirement of prudence in travel cost are also "governing regulations," with which Paddack was obliged to, but did not, comply. Since the plain terms of those regulations apply to the Paddacks' travel, there is no need to reach the issue of deference to the Grievance Board. *See International Union, UAW*, 815 F.2d at 1575 (finding a governing "general duty ... distinct and separate from" specific duty in statutory scheme and deeming its "plain language" dispositive under step one of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

Riverboats may be a "normal mode of transportation on the river," but riverboats that are luxury hotels and provide tours of historic sites at stopping places are not. Motor vehicles may be a normal mode of transportation, but surely no Foreign Service officer could think that meant he was free to move himself and his family from New Orleans to St. Louis by renting a limousine with chauffeur and tour guide for $12,000. Nor could the officer consider their limousine journey permissible simply because the Travel Regulations state generally that surface travel is "authorized." Even if the limousine were for some reason the only surface transportation available, an officer using good judgment still could not select it if travel by air at routine prices was possible.

I therefore conclude that Paddack's decision to travel on the Mississippi Queen, and the Grievance Board's upholding of that decision, were not in accord with the traveler's exercise of good judgment required by the Travel Regulations.

---

**2.** As for the unchallenged prior travel of other government employees on oceanliners like the Queen Elizabeth II, I believe it sufficient to say that Paddack's awareness of such travel, whether permitted by the Travel Regulations or not, doubtless affected his judgment but cannot transform Paddack's cruise into an exercise of good judgment.