Paul D. **MOLINEAUX, et al.,** Appellants,

v.

**UNITED STATES of America, et al.**

No. 92–5208.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1993.

Decided Jan. 7, 1994.

Thomas G. Corcoran, Jr. argued the cause for appellants. With him on the brief was Bridget R. Mugane.

Diane Sullivan, Asst. U.S. Atty., argued the cause for appellees. With her on the brief were J. Ramsey Johnson, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys.

Before: EDWARDS, SILBERMAN, Circuit Judges, and MILTON I. SHADUR,* Senior District Judge, United States District Court for the Northern District of Illinois, Eastern Division.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This is an appeal from a district court order affirming a decision of the Foreign Service Grievance Board. Appellants, Foreign Service Officers, claim that the Secretary of State violated a statutory requirement that the number of Foreign Service promotions be based on a long-term projection designed to provide a regular, predictable flow of promotions. The Board determined that appellants' arguments were without merit, and the district court agreed. We affirm.

## I.

In 1980, Congress laid down a framework for hiring, promoting, and retaining Foreign Service Officers. Foreign Service Act of 1980, Pub.L. No. 96–465, 94 Stat. 2071 (1980). Just as the military, the Foreign Service is an "up or out" system. Officers, after a probationary period, are granted "career appointments." 22 U.S.C. §§ 3941(d), 3946 (1988). After securing a career appointment, an officer has 20 years to be promoted into the Senior Foreign Service (SFS); failing such a promotion, an officer is involuntarily retired. 22 U.S.C. § 4007 (1988). Congress enacted the Foreign Service Act of 1980, in part, to deal with personnel problems stemming from a perceived lack of opportunities for promotion into the SFS.

Section 601(c)(2) of the Act directs the Secretary of State to determine the number of promotions "based upon a systematic long-term projection of personnel flows and needs designed to provide [inter alia] a regular predictable flow of talent ... into the SFS." 22 U.S.C. § 4001(c)(2)(C) (1988).[1] To comply with the statute, the Secretary devised a personnel model to help him determine the number of needed promotions. The model generates promotional estimates for each of five years based on the attrition of existing officers, the number of available positions and the available people at each level, and other estimated figures. These estimates are then averaged, and the resulting average is used for the upcoming year as the available number of promotions.[2] In two years, 1984 and 1985, the five-year rolling average was itself averaged with the projection for the upcoming year (so-called double-averaging), thus putting more weight on the upcoming year.

Appellants are 22 individuals who were Class One Foreign Service Officers (Officers or FSO–1s) prior to their involuntary retirement. After the Department rejected their claim that the State Department violated section 601(c)(2) by not basing the number of promotions upon the required systematic, long-term projections, the Officers filed grievances with the Foreign Service Grievance Board. Some sought retroactive promotion, while others desired an extension of time in which to gain a promotion, and a few who had resigned or retired sought reinstatement.

The Officers argued that the Department's projections were not "designed to provide" a

* Sitting by designation pursuant to 28 U.S.C. § 294(d).
1. In full, section 601(c)(2) provides:
    Decisions by the Secretary on the numbers of individuals to be promoted into and retained in the Senior Foreign Service shall be based upon a systematic long-term projection of personnel flows and needs designed to provide—
    (A) a regular, predictable flow of recruitment in the Service;
    (B) effective career development patterns to meet the needs of the Service; and
    (C) a regular, predictable flow of talent upward through the ranks and into the Senior Foreign Service.

22 U.S.C. § 4001(c)(2)(A)–(C) (1988).

2. Though the Secretary technically "promotes" foreign service officers, he follows the recommendations of selection boards. 22 U.S.C. § 4005 (1988). Selection boards, using criteria established by the Secretary, determine who will be promoted. 22 U.S.C. § 4002(a) (1988). The promotion recommendations must be "in accordance" with § 4001 and thus the boards may not recommend promotions beyond the number generated by the Secretary under § 4001. 22 U.S.C. § 4002(a)(1) (1988).

regular, predictable flow because when new circumstances arose, the Department did not take steps to ensure appropriate promotion into the SFS. When it became apparent that a decline in voluntary senior attrition was occurring and that positions within the SFS would be eliminated, the Department should, it is argued, have taken steps to counteract a decline in FSO–1 promotions. Instead of increasing egress from the SFS to accommodate the FSO–1s, however, the Department decreased the number of promotions by issuing limited career extensions[3] to SFS Officers who might otherwise be forced out. The Officers claimed that the Department ultimately subordinated the regular predictable flow requirement to its desire to retain current SFS Officers.[4]

Appellants further asserted that the Department, by misrepresenting the likelihood of promotions, misled them into entering a competition for promotions into the SFS earlier than they would have done otherwise. Under the statutory and regulatory scheme, FSO–1s must choose to open their six-year promotional "windows" to compete for promotions into the SFS. If officers are not promoted within those six years, they are involuntarily retired. After receiving a Department letter which assured all officers that the Secretary would comply with the Act when determining the number of promotions, appellants opened their windows.

The Department responded that the projections used by the Secretary did not have to "ensure" a regular, predictable flow. As long as they were "designed to provide" such a flow, the statute was satisfied. The Department also claimed that promotion was not given absolute priority over all other departmental interests. The statute did not force the Department to ignore other needs in order to obtain a steady progression into the SFS.

In a lengthy opinion, the Board concluded that the Department had not violated the statute.[5] The Board reasoned that though there had not been a regular, predictable flow of promotions into the SFS, it agreed with the Secretary that the statute did not actually require such a flow. The Department was obliged only to develop projections which were "designed to provide" the flow. Designed to provide meant something akin to "reasonably calculated to achieve certain outcomes, or designed to serve the purpose of bringing about." The Department's model met that standard. Had all the assumptions about future trends been correct, the congressional goal of a regular, predictable flow might have been met as well.

With respect to the Officers' contentions that the Department had improperly subordinated promotions to senior retention, the Board concluded that legitimate unanticipated occurrences—the decline in senior attrition and a decline in the total number of senior positions—permitted the Department to retain SFS Officers over promoting FSO–1s. The Department did not need to annually adjust the amount of SFS attrition when it became clear that there was less voluntary departure and that some SFS positions would be eliminated. In other words, the statute did not require that the Department increase the number of SFS Officers leaving the Service to make way for FSO–1s.

## II.

The Officers assert that the Secretary of State did not comply with the statute because the number of promotions actually generated by the model was not based upon a

3. Limited career extensions enable SFS Officers to prolong their career in the Foreign Service even when their time-in-class limit has expired. 22 U.S.C. §§ 4002, 4007(b) (1988). Time-in-class limitations require that SFS Officers be involuntarily retired should they not receive a promotion to a higher SFS class level. 22 U.S.C. § 4007(a) (1988).

4. During the period in which appellants were competing for promotions (1981–87), there was great variation in the number of FSO–1s promoted into the SFS. Though there were 69 promotions in 1981, that figure dipped to 39 by 1984 before climbing to 72 in 1987. Appellants contended that had the Department set the number of promotions as required by statute, it would have taken steps to ensure more promotions in the mid–80s and thus increased their chances of procuring a promotion.

5. The Board thought that the *only* issue in dispute was whether the projections were "designed to provide" the three statutory objectives.

"long-term projection," was not "systematic," and the model was not "designed to provide" a "regular, predictable flow of promotions." This language, as is apparent, is not very precise. Rather than specifying a set number of yearly promotions into the SFS, Congress merely instructed the Secretary to fix the number of available promotions based on a long-term projection. 22 U.S.C. § 4001(c)(2)(C) (1988). Indeed, before the Board, the Department unsuccessfully argued that section 601 provides "no law to apply," *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The government does not reiterate the argument before us, but we acknowledge that the statutory language has little bite; the command is muted—one of emphasis, even attitude, rather than exact instructions. The words "long-term projection" and "regular, predictable flow of promotions" obviously permit a range of interpretation and application.

Accordingly, the government argues that *Chevron* deference is owed to the Secretary's interpretation of the language, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the Board's conclusion that the model complied with the statute is likewise subject to only limited review—as a finding of fact. We have previously considered the interrelationship between the Secretary and the Board in the context of judicial deference. *See United States v. Paddack*, 825 F.2d 504, 513–14 (D.C.Cir.1987). In that case, involving an interpretation of the State Department's travel expense regulations, the Board rejected the Department's interpretation. We refused to defer to the Secretary because the United States Information Agency, the employing agency within the Department, had actually changed its interpretation under pressure from the General Accounting Office, and the Secretary had not actually offered a departmental interpretation of the regulation. Under those unusual circumstances, we felt obliged to defer to the Board, whose decision we were charged with reviewing. *Id.* at 514.

The Supreme Court, faced subsequently with an analogous situation—whether to de-fer to the Secretary of Labor's construction of her regulation in an appeal from the Occupational Safety and Health Review Commission or to defer to the Commission's contrary construction—determined that the policies underlying the doctrine of judicial deference to an agency's regulatory interpretation counseled deference to the Secretary rather than to an independent adjudicatory agency. *See Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150–57, 111 S.Ct. 1171, 1176–79, 113 L.Ed.2d 117 (1991). The provisions in OSHA dealing with judicial review of the Commission spoke only of findings of fact. Those findings were to be treated as "conclusive" so long as "supported by substantial evidence". 29 U.S.C. § 660(a) (1988). Accordingly, the Court concluded that Congress meant the Commission to be treated by the courts of appeals as equivalent to a "nonpolicymaking" district court. *Id.* at 154, 111 S.Ct. at 1177. Here the statute's judicial review provision, as we noted in *Paddack*, incorporates the standard APA review sections. 22 U.S.C. § 4140 (1988). And, so it is not clear whether Congress meant the Board to be reviewed more like a typical administrative agency or like a district court (indeed, here, review of the Board, unlike the Commission, is directed first to a district court). *Id.*

In any event, we think the Secretary's interpretation of the statute, advanced before the Commission, is entitled to deference whatever the character of the Board. Congress delegated to the Secretary authority to set the number of promotions, to develop the promotion model, and to establish promotion criteria. *See* 22 U.S.C. § 4001–4006 (1988). Although the Secretary had not set forth his statutory interpretation in any formal manner prior to the litigation, that step is unnecessary when the Secretary's interpretation is presented to the Board. "The Secretary's interpretation of ... regulations in an administrative adjudication, however, *is* agency action, not a *post hoc* rationalization of it." 499 U.S. at 157, 111 S.Ct. at 1179.

In this case, of course, the Secretary and the Board are essentially in agreement as to the statute's meaning. We do not think the Board's conclusion that the Secretary prop-

erly complied with the statute should be regarded (as does the government) as a finding of fact. Instead, the Board's conclusion seems to us to be an approval of the Secretary's application of the statute which, as in the typical judicial review of agency action, is a question of law. If the Board had found facts, its findings would be entitled to deference, but since the Board approved the Secretary's statutory interpretation, it is basically the Secretary's interpretation that is before us buttressed by the deference Chevron requires us to afford.

### III.

The Officers appear to raise somewhat different arguments before us than they did before the Board. They had asserted below that the Department's model was not "designed to provide" a regular, predictable flow and that the Department had subordinated the congressional goal of increased promotions into the SFS to the departmental desire to retain experienced SFS officers. They seem to have modified their argument by also contending that the Department's projections were neither "long-term" nor "systematic" and that the Department should have anticipated and adjusted for a decline in senior attrition and a shrinking number of SFS positions.[6]

Thus, although the Board understandably thought that the long-term nature of the model was undisputed, the appellants claim that the Board's conclusion was unreasonable—at least with respect to 1984 and 1985. The model estimated promotions over a five-year period using projected rates of attrition (voluntary and involuntary departure from the Foreign Service), the number of Officers who would receive limited career extensions, and other variables. The average number of annual promotions over the next five years became the new number of promotions in the upcoming year. The five-year averaging technique was designed to smooth out dramatic declines and upswings in yearly promotions, and, therefore, the number of promotions for an upcoming year was made on a long-term projection of future employment needs.

As noted in 1984 and 1985, however, the department changed its model, using "double-averaging" instead of five-year averaging. The Department took the average developed for the five-year period and averaged that figure with the expected number of promotions in the upcoming year, which is just a fancy way of saying the Department bent its long-term projection to account for some shorter term factors and, therefore, in the disputed years, made the projection less long-term in character.

Although they would have preferred a projection which was even more long-term, the Officers concede that five-year averaging met the statutory requirement of "long-term." But not, according to appellants, the double-averaging adjustment. That was simply a device to escape the restraints of a "long-term" projection. The appellants have a point, but we do not see how we can quarrel with the Board's general conclusion that the projection had a "long-term" nature. While double-averaging puts more emphasis on short-term factors, the Secretary's adjustment of the averaging method did not wholly vitiate the "long-term" character of the projection.[7]

Alternatively, according to appellants, the basic projections were neither "systematic" nor "designed to provide a regular, predictable flow" because the Department did not forthrightly take into account the expected overall decline in Senior Foreign Service positions and the predictable decline in voluntary retirement of senior officers. In other words, the Department blinked at or ignored what appellants claim was the entirely foreseeable diminution in available vacant senior positions and therefore the projection was flawed at the outset. Had the Secretary

---

6. We ordinarily do not consider points not pressed before the agency. The government, however, failed to object—thereby "waiving" any "waiver" argument—so we entertain appellants' arguments.

7. The appellants also asserted that most factors that were fed into the model were developed on an ad hoc basis rather than based on long-term projections. Still, the number of promotions was based on a projection of future personnel needs and that is all the statute required.

candidly confronted the "problem"—that in the 1980s for various allegedly predictable reasons, FSO–1s would have inadequate promotional opportunities—the Secretary would have been obliged to take certain actions which would have freed up more SFS positions. However, appellants did not argue, and the Board did not find that the Secretary's projections were made in bad faith. Absent such a determination, it is difficult to see how the Board could have concluded that the projection lacked the statutory characteristics. We certainly have no analytical basis for disputing the Secretary's judgment or the Board's approval of that judgment.

To be sure, the statute, by using the phrase "regular, predictable flow," appears to suggest that the Secretary should have cleared spaces at the top of the Service for talented officers. Congress was surely concerned that the Foreign Service, perhaps like all bureaucracies, would tend to value its most senior and experienced officers over aspiring younger ones. The Board read the statute as having that cast. We note, however, that "regular, predictable flow" was only one of three characteristics the Secretary's projections were asked to deliver. It will be recalled that "effective career development patterns to meet the needs of service" was also to be considered. And that factor—if not interpreted to mean virtually anything the Secretary wanted—might at least be thought to be somewhat in tension with the factor the appellants emphasize. Nevertheless, though the Board did not make much of this point, it reasonably held that the Secretary was correct when he asserted that the model was designed to provide a regular, predictable flow.

At bottom, appellants' claim is that the Secretary's model and, even more, the actual number of promotions generated by the model favored Senior Foreign Service Officers over FSO–1s. We are not unsympathetic to their claims. Still, Congress simply did not place sufficient restrictions on the Secretary's projection or his personnel decisions to provide appellants with much of a legal argu-

ment. Congress could, for instance, have required a set level of senior officer attrition. It did not. It took smaller steps. It imposed time-in-class limits on all SFS officers. If SFS officers did not receive a promotion into a higher SFS class level within a specified number of years, they would be involuntarily retired. See 22 U.S.C. § 4007(a) (1988). Congress also restricted the availability of limited career extensions which enable SFS officers to stay in their positions even when their time-in-class has expired. 22 U.S.C. §§ 4002, 4007(b) (1988). But, Congress never really took aim at the heart of the problem of which appellants complain. In the absence of more specific congressional mandates, we do not see how the Board's decision in favor of the Secretary can be challenged.[8]

\*     \*  ,  \*     \*     \*     \*

Accordingly, the judgment of the district court is hereby affirmed.

---

8. Appellants' misrepresentation claim is premised on the assumption that the Department did not comply with the statute. Since we reject this argument, the misrepresentation claim is eliminated.